UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA

UNITED STATES TRUST COMPANY, N.A.,

     *Plaintiff,*

v.

STANFORD GROUP COMPANY

     *Defendant.*

**COMPLAINT**

Plaintiff United States Trust Company, N.A. (including all predecessors in interest, "U.S. Trust" or "Plaintiff") hereby brings this Complaint for damages and other relief against defendant Stanford Group Company ("Stanford Group") as follows:

## INTRODUCTION

1.    In July 2007, Stanford Group opened its 17th U.S. Private Client Group in Greensboro, North Carolina, in direct competition with U.S. Trust. Rather than building the business in this office legally, Stanford Group induced eleven of U.S. Trust's Greensboro employees to resign from U.S. Trust and immediately begin utilizing the confidential business information that they gained while working at U.S. Trust to solicit U.S. Trust's clients. The employees induced to leave U.S. Trust were the primary contacts for approximately 90% of U.S. Trust's clients serviced from the Greensboro office. Also, these departures were secretly coordinated and carefully planned to take advantage of the transition in the ownership of U.S. Trust, which was acquired by a subsidiary of Bank of America Corporation ("BAC") effective July 1, 2007. Around the same time, Stanford Group induced an employee of U.S. Trust's

Charlotte office to resign, and to immediately begin utilizing the confidential information that he gained while working at U.S. Trust to solicit U.S. Trust's clients. Just in the last two months, Stanford Group continued its North Carolina expansion, by recruiting two additional U.S. Trust Greensboro employees, both with knowledge of U.S. Trust's confidential business information. By these raids, the Stanford Group seeks to steal, rather than lawfully develop or purchase, extensive client relationships and goodwill associated with these employees.

2. Beyond the unfair competition and tortious conduct reflected by these actions, Defendant's competition, solicitation of U.S. Trust employees and use of U.S. Trust's confidential information and trade secrets caused former employees of U.S. Trust to breach various contractual agreements, including covenants not to compete, non-solicitation agreements and confidentiality agreements.

3. When the former U.S. Trust employees resigned from U.S. Trust, they refused to disclose the identity of their new employer. Once U.S. Trust learned this information, it demanded that the former employees abide by their contractual obligations. U.S. Trust also informed Stanford Group about the individuals' post-employment restrictions and sought assurances from Stanford Group that it would not allow the employees to violate their contractual obligations. However, it is unfortunately clear from the individuals' continued efforts to solicit their former clients and public statements made by representatives of Stanford Group that they intend to continue their unlawful conduct. Therefore, U.S. Trust filed this action asserting claims for: (i) tortious interference with contractual relations; (ii) tortious interference with business relations; (iii) unfair competition; and (iv) misappropriation of trade secrets.

## PARTIES, JURISDICTION AND VENUE

4. U.S. Trust is a corporation organized under the laws of Delaware with its principal place of business located at 114 West 47th Street, New York, New York 10036. U.S.

Trust is a former subsidiary of U.S. Trust Corporation ("USTC") and regularly does business in Charlotte, Mecklenburg County, North Carolina. On July 1, 2007, a subsidiary of Bank of America Corporation acquired U.S. Trust by purchasing all of its stock.

5.      Stanford Group is a corporation organized under the laws of Texas with its headquarters in Houston, Texas. Stanford Group is registered to do business in North Carolina and maintains its primary North Carolina office in Charlotte, Mecklenburg County, North Carolina. Upon information and belief, Stanford Group's Executive Director of the Carolinas Region is also based in Charlotte.

6.      Jurisdiction is proper pursuant to 28 U.S.C. § 1332.

7.      Venue is proper in this Court pursuant 28 U.S.C. § 1391.

## THE FACTS

**A.    U.S. Trust's Business**

8.      U.S. Trust is a financial services company that offers fully integrated wealth management solutions including investment management, planning services, trust and fiduciary services, and deposit and credit services.

9.      U.S. Trust purchased North Carolina Trust Co. ("NC Trust") in May of 1999. As a result of the transaction, all NC Trust employees became U.S. Trust employees. In January of 2000, Charles Schwab Corporation purchased U.S. Trust.

10.     The services offered by U.S. Trust through its Greensboro and Charlotte offices fall primarily into two categories: (1) wealth management services to individual clients ("Wealth Management Services"), and (2) investment management services to institutional clients ("Institutional Services"). The individuals hired by Stanford Group provided Wealth Management Services to U.S. Trust's individual clients.

11. With respect to its Wealth Management Services, all of U.S. Trust's clients are divided between, and serviced by, Relationship Management Teams and Wealth Managers. The Relationship Management Teams and Wealth Managers help clients access various specialized services offered by U.S. Trust that suit the clients' particular needs.

12. Each Relationship Management Team is headed by a Relationship Manager. The Relationship Manager is assisted by an Associate Relationship Manager and a Client Service Officer. Each Relationship Management Team and Wealth Manager is also supported by other U.S. Trust employees, including Portfolio Managers, Investment Specialists, Wealth Structuring Specialists and Bankers.

13. The Relationship Manager is the core business development officer and relationship manager for typically larger U.S. Trust clients. Relationship Managers are responsible for marketing the services offered by U.S. Trust to prospective clients and overseeing delivery of those services to clients. Relationship Managers are often provided with the names of prospective clients by U.S. Trust and/or its affiliates. Upon identifying and meeting a prospective client, Relationship Managers work with the Relationship Management Team and other U.S. Trust affiliates to attract and ultimately service the client.

14. Associate Relationship Managers work closely with U.S. Trust clients on day-to-day business dealings. Indeed, the Associate Relationship Manger is the primary person for the client with regard to everyday requests and needs. Thus, Associate Relationship Managers learn each customer's particular needs and preferences and are charged with ensuring that each client's needs are fulfilled.

15. Wealth Managers are the primary relationship managers for relatively smaller or less complex U.S. Trust clients. Wealth Managers are responsible for coordinating the delivery of the comprehensive Wealth Management platform to U.S. Trust clients.

16. Client Service Officers are responsible for all of the transactional flow of client activity and/or follow-up needed for U.S. Trust client accounts. Through these responsibilities, Client Service Officers also learn detailed information about clients and client accounts.

17. Portfolio Managers are responsible for assessing client risk tolerance, establishing asset allocation, goals and strategies, and the selection of individual stocks for client portfolios. Portfolio Managers provide a specialized service and are ordinarily chosen by Relationship Managers or assigned by an office manager to work on specific client accounts. Investment Specialists work closely with U.S. Trust's clients to assess risk tolerance and establish asset allocation, to comprehensively evaluate equities and funds, and develop customized allocation models with strategically chosen investments suited to meet the client's financial objectives. Wealth Structuring Specialists also work closely with clients, providing customized financial, wealth and estate planning services to the U.S. Trust's clients. Investment Specialists and Wealth Structuring Specialists are available to work on specific client accounts at the request of Relationship Managers.

18. U.S. Trust expends substantial sums to attract and service its Wealth Management clients. U.S. Trust pays and employs its Wealth Management employees to create, maintain and cement U.S. Trust's relationships with its Wealth Management clients. In addition to their compensation, which includes base pay, bonuses and additional compensation for attracting new clients, Wealth Management employees are reimbursed for the significant expenditures incurred in connection with client entertainment and development. Also, U.S. Trust spends a significant

amount of money to advertise its services nationally in an effort to generate name recognition and goodwill.

**B.    The Stanford Group's North Carolina Expansion**

19.    Stanford Group Company is a member of the Stanford Financial Group of Companies, a global network of privately held, wholly owned financial service companies founded by Lodis B. Stanford in 1932.

20.    Stanford Group's core business is wealth management for high-net worth individuals.

21.    U.S. Trust and Stanford Group are competitors in providing wealth management services.

22.    Upon information and belief, Stanford Group opened its first North Carolina office in Charlotte in 2006, and staffed it by hiring several employees from the Private Bank of Bank of America.

23.    Greensboro marks Stanford Group's 17th U.S. Private Client Group office.

24.    In addition to Greensboro and Charlotte, the company has offices in Boca Raton, Miami and Longboat Key, FL; Houston, Dallas, and Austin, TX; Memphis and Nashville, TN; Denver, Colorado; Atlanta, Georgia; Little Rock, Arkansas; Baton Rouge and Lafayette, LA; and Jackson and Tupelo, MS.

25.    The Stanford Group Greensboro team consists of Managing Directors John Rich and Glenda Burkett; Senior Vice Presidents M. Jo Brooks, Ken Dimock, Anthony Monforton, Virginia Saslow, William "Wes" Wastson; Suzanne Wilcox, Sandy Boes, Kim Lemons, and Kim van Zee (collectively, the "Greensboro team").

26.     On July 12, 2007, Stanford Group sent out a press release to media outlets identifying the members of its newly formed Greensboro office. All members identified in the July 12, 2007 press release are all former employees of U.S. Trust.

27.     Following the initial formation of the Greensboro office, Stanford Group continued its raiding of U.S. Trust employees, by recruiting John "Whit" Wilks to join Stanford Group's Charlotte office, and recruiting Tracy Ross and Rhonda Tate to join Stanford Group's Greensboro office.

## C.     The Former Employees

28.     John Rich is a former Regional Investment Manager and Portfolio Manager of U.S. Trust's Greensboro office. Rich began employment with U.S. Trust in or about December 5, 1988. Rich had extensive client contact with a substantial number of clients serviced by U.S. Trust and client relationship management responsibility. Rich participated in planning and development sessions with senior level U.S. Trust officers regarding the continued delivery of investment services to clients following the BAC acquisition.

29.     Glenda Burkett is a former Relationship Manager and Business Development Officer employed by U.S. Trust in the Greensboro office. Burkett began her employment with U.S. Trust in July of 1994. At the time of her resignation, Burkett was Senior Vice President, Business Development for U.S. Trust. Burkett had extensive client contact with a substantial number of U.S. Trust clients and was responsible for developing business and interacting with clients serviced by U.S. Trust's Greensboro office and throughout the region.

30.     Anthony Monforton is a former Portfolio Manager employed by U.S. Trust in the Greensboro office. Monforton began his employment with U.S. Trust in June of 1994. At the time of his resignation, Monforton was Senior Vice President and Portfolio Manager of U.S.

Trust. Monforton also had extensive client contact with a substantial number of U.S. Trust clients and was responsible for interacting with clients and managing client relationships serviced by U.S. Trust's Greensboro office and throughout the region.

31.     Martha Jo Brooks is a former Associate Relationship Manager and Client Relationship Officer employed by U.S. Trust in the Greensboro office. Brooks began her employment with U.S. Trust in June of 1992. At the time of her resignation, Brooks was Senior Vice President of U.S. Trust. Brooks had extensive client contact and managed client relationships serviced by U.S. Trust's Greensboro office.

32.     Ken Dimock is a former Wealth Manager and Client Relationship Officer employed by U.S. Trust in the Greensboro office. Dimock began his employment with U.S. Trust in June of 1985. At the time of his resignation, Dimock was a Senior Vice President of U.S. Trust. Dimock had extensive client contact and managed client relationships serviced by U.S. Trust's Greensboro office.

33.     William "Wes" Watson is a former Wealth Manager employed by U.S. Trust in the Greensboro office. Watson began his employment with U.S. Trust in September of 1991. At the time of his resignation, Watson was a Senior Vice President of U.S. Trust. Watson had extensive client contact and managed client relationships serviced by U.S. Trust's Greensboro office.

34.     Suzanne Wilcox is a former Wealth Manager employed by U.S. Trust in the Greensboro office. Wilcox began her employment with U.S. Trust in September of 1997. At the time of her resignation, Wilcox was a Vice President of U.S. Trust. Wilcox had extensive client contact and managed client relationships serviced by U.S. Trust's Greensboro office.

35. Virginia Saslow is a former Associate Relationship Manager and Client Relationship Officer employed by U.S. Trust in the Greensboro office. Saslow began her employment with U.S. Trust in August of 1987. At the time of her resignation, Saslow was a Senior Vice President. Saslow had extensive client contact and managed client relationships serviced by U.S. Trust's Greensboro office.

36. Suzanne Boes is a former Portfolio Analyst employed by U.S. Trust in U.S. Trust's Greensboro office. Boes began her employment with U.S. Trust in May of 1995.

37. Kim van Zee is a former Relationship Team Administrator employed by U.S. Trust in U.S. Trust's Greensboro office. Van Zee began her employment with U.S. Trust in October of 1995.

38. Kim Lemons is a former Client Service Officer employed by U.S. Trust in U.S. Trust's Greensboro office. Lemons began her employment with U.S. Trust in May of 2000.

39. John "Whit" Wilks is a former Associate Relationship Manager and Client Relationship Officer employed by U.S. Trust in the Charlotte office. Wilkes began his employment with U.S. Trust in November 1997. At the time of his resignation, Watson was a Senior Vice President of U.S. Trust. Watson had extensive client contact and managed client relationships serviced by U.S. Trust's Charlotte office and throughout the region.

40. Tracy Ross is a former First Level Officer employed by U.S. Trust in U.S. Trust's Greensboro office. Ross begin her employment with U.S. Trust in July 31, 2000.

41. Rhonda Tate is a former First Level Officer employed by U.S. Trust in U.S. Trust's Greensboro office. Tate began her employment with U.S. Trust in August 24, 1998.

**D.    Post-Employment Restrictions**

42. At the outset of their employment with NC Trust, and at various times during

their employment with U.S. Trust, its predecessors and successors, Rich, Burkett, Brooks, Dimock, Monforton, Saslow, Watson and Wilks, agreed in writing to certain post-employment contractual obligations concerning the use or disclosure of confidential information, the solicitation of clients and agreement not to compete with Plaintiff following their respective separations from employment. Rich, Burkett, Brooks, Dimock, Saslow, Watson, and Wilks received good and valuable consideration for their promises.

### _Burkett, Brooks, Dimock, Monforton, Saslow, Watson and Wilks_

43.  Burkett, Brooks, Dimock,[1] Monforton, Saslow, Watson and Wilks most recently entered into individual Noncompetition and Nonsolicitation Agreements on February 18, 1998 (the "1998 Noncompete Agreement"). On or about the same day, each employee received a grant of stock options. The grant of options were expressly conditioned upon and in consideration for their execution of the agreements.

44.  In the 1998 Noncompete Agreements, Burkett, Dimock, Monforton, Brooks, Saslow, Watson and Wilks each agreed that for a period of twelve (12) months following termination of their employment, they would not engage in the business of providing investment management services, company fiduciary services, or otherwise divert any company client or employee to terminate their association with the company. Specifically, the 1998 Noncompete Agreement provides, in part:

> 1. (a) "Restricted Territory" shall mean the State of North Carolina.
>
> 2.    Restrictions on Competition and Solicitation. During Employee's employment by [U.S. Trust] and, if Employee terminates employment with [U.S.

---

[1]    U.S. Trust has been unable to locate a significant portion of Mr. Dimock's personnel file, including his 1998 Noncompete Agreement. Mr. Dimock executed the 1998 Noncompete Agreement and the Consent Agreement in exchange for his right to cash out and receipt of unvested NC Trust stock options. Moreover, prior to his departure, Mr. Dimock requested and received a copy of both agreements.

Trust] voluntarily or if the employment of Employee is terminated by [U.S. Trust] for cause, as determined in good faith by the Board of Directors of [U.S. Trust], for a period of 12 months following such termination:

(a) Employee will not, directly or indirectly through others, within the Restricted Territory;

(i) Engage in the Company Fiduciary Business[2] or any material aspect thereof for Employee's own account, as an employee or in any other capacity, including, without limitation, as a partner, officer, director, member, manager, principal, agent, trustee or consultant; or

(ii) Engage in the Company Investment Management Business or any material aspect thereof for Employee's own account, as an employee or in any other capacity, including, without limitation, as a partner, officer, director, member, manager, principal, agent, trustee or consultant;

provided, however, that nothing herein shall prevent Employee from being employed by or affiliated with any person or entity if Employee's duties and responsibilities for such person or entity are unrelated to any material aspect of the Company Fiduciary Business or the Company Investment Management Business and provided further that nothing herein shall prevent Employee from being a passive investor in any entity; and

(b) Employee will not, directly or indirectly through others, within the Restricted Territory or elsewhere:

(i) Provide investment management services or fiduciary services of the type then offered by [U.S. Trust] to or for any Restricted Client[3] or supervise, manage or otherwise assist in the rendering of any such services to or for a Restricted Client;

(ii) Provide investment management services or fiduciary services of the type then offered by [U.S. Trust] to or for any Restricted Territory Client [defined in the agreement as a Restricted Client having a residence or place of business in the Restricted Territory];

---

[2] Company Fiduciary Business and Company Investment Management Business are defined as the business of providing fiduciary and investment management services to individuals and business entities.

[3] "Restricted Client" is defined in the agreement as a person or entity who is a client of U.S. Trust at the time of an employee's termination or at any time during a period of one year prior to the employee's termination, or was otherwise a prospective client listed on certain U.S. Trust prospect lists.

(ii)    Call upon or cause to be called upon, or solicit or assist in the solicitation of, any Restricted Client for the purpose of providing to the Restricted Client any investment management services or fiduciary services of the type then offered by [U.S. Trust];

(iv)    Call upon or cause to be called upon, or solicit or assist in the solicitation of, any Restricted Territory Client for the purpose of providing to the Restricted Territory Client any investment management services or fiduciary services of the type then offered by [U.S. Trust];

(v)    Influence or persuade or attempt to influence or persuade any Restricted Client to terminate his, her or its relationship with [U.S. Trust[ or otherwise interfere or attempt to interfere with the relationship between [U.S. Trust] and any Restricted Client;

(vi)    Influence or persuade or attempt to influence or persuade any Restricted Client to terminate his, her or its relationship with [U.S. Trust[ or otherwise interfere or attempt to interfere with the relationship between [U.S. Trust] and any Restricted Territory Client; or

(vii)    Call upon or cause to be called upon, or solicit or assist in the solicitation of, any employee of [U.S. Trust] for the purpose of persuading or influencing the employee to terminate his or her employment with [U.S. Trust];

\* \* \* \*

True and accurate copies of the respective 1998 Noncompete Agreements are attached hereto collectively as **Exhibit** 1.

45.    Approximately one year later on or about May 14, 1999, NC Trust merged with U.S. Trust Corporation ("USTC"). To ensure USTC received the full value of NC Trust's goodwill, USTC sought to confirm and continue the obligations set forth in the 1998 Noncompete Agreements.

46.    In anticipation of the merger of NC Trust and USTC, Burkett, Brooks, Dimock, Monforton, Saslow, Watson and Wilks each executed Consent to Continuation of Noncompetition and Nonsolicitation Agreements (the "Consent Agreements"). True and accurate copies of the respective Consent Agreements are attached hereto collectively as **Exhibit**

2.

47.     As consideration for continuing the restrictions, contained in the 1998 Noncompete Agreement, these individuals were paid substantial amounts "cashing out" unvested NC Trust stock options for which they were not otherwise entitled to receive payment. The payment to each of these defendants pursuant to the execution of the Consent Agreements was as follows:

      a)      Burkett received a payment of $45,637;

      b)      Brooks received a payment of $27,555;

      c)      Dimock received a payment of $42,187;

      d)      Monforton received a payment of $76,537;

      e)      Saslow received a payment of $3,581;

      f)      Watson received a payment of $15,256;

      g)      Wilks received a payment of $10,260.

### *John Rich*

48.     In consideration for Rich's participation in The Charles Schwab Corporation 2004 Stock Incentive Plan, Rich executed an agreement with U.S. Trust in 2004 in which he agreed that for certain periods during and after his employment with U.S. Trust, he would not engage in any business competitive with U.S. Trust, or otherwise divert U.S. Trust clients or employees to terminate their association with U.S. Trust (the "Rich Employment Agreement"). The Rich Employment Agreement provides, in relevant part:

      2.     **Non-Solicitation of Clients and Employees.**

      To further protect Confidential and Proprietary Information of U.S. Trust and the good will associated with the client and prospective client relationships of U.S. Trust, you agree that:

a)      during your employment with U.S. Trust, and for a period of twelve (12) months following termination of your employment with U.S. Trust, you will not, directly or indirectly, solicit or induce existing or prospective U.S. Trust clients, to whom you provided services or with respect to whom you devoted efforts seeking to provide such services, to transfer or divert business from U.S. Trust or otherwise to avoid, diminish or discontinue a relationship with U.S. Trust and

b)      during your employment with U.S. Trust, and for a period of twelve (12) months following termination of your employment with U.S. Trust, you will not, directly or indirectly, solicit, induce or encourage any U.S. Trust employee to terminate employment with U.S. Trust to join a business competitive with the business of U.S. Trust.

A true and accurate copy of the Rich Employment Agreement is attached hereto as **Exhibit** 3.

49.      In the Rich Employment Agreement, Rich further agreed that he would not improperly use or disclose U.S. Trust's confidential and proprietary information, and that he would further return all such information immediately upon termination of his employment. The Rich Employment Agreement provides, in relevant part:

1.      Confidential and Proprietary Information.

In connection with your employment by U.S. Trust you will have (and you hereby acknowledge you have) access to sensitive, non-public information of U.S. Trust and its clients including, but not limited to: a) client-related information (i.e. client names, client contact information, client lists, client account contents and statements, investment, estate and taxation strategies, current and historical investment performance data, etc.) b) employee, vendor and independent contractor information (i.e. names and contact information, personal and financial information, services, compensation, rate structures, etc.) and c) business information of U.S. Trust (i.e. financial performance, marketing, sales, product and regulatory information etc.) (collectively "Confidential and Proprietary Information"). You agree that you will not disclose or permit or facilitate disclosure of Confidential and Proprietary Information to persons outside of U.S. Trust or use such information for purposes other than as specifically authorized by U.S. Trust for purposes intended by U.S. Trust.

3.     Return of Records

Immediately upon termination of your employment with U.S. Trust, you agree to return all Confidential and Proprietary Information in your possession, custody and control to U.S. Trust and provide a sworn certification that you have done so.

50.     Saslow, Watson, Wilcox and van Zee each executed a Confidentiality and Nondisclosure Agreement ("Confidentiality and Nondisclosure Agreement") wherein they agreed not to use or disclose U.S. Trust's proprietary information outside of their employment, and to return all U.S. Trust proprietary information upon termination of their employment with U.S. Trust.[4] Specifically, the Confidentiality and Nondisclosure Agreements provide, in relevant part:

(2)     I hereby agree that all Proprietary Information will be the sole property of [U.S. Trust], and I hereby assign to [U.S. Trust] all rights I may have or acquire in Proprietary Information prepare or developed by me at any time as an employee of [U.S. Trust]. At all times, both during my employment by [U.S. Trust] and thereafter, I will keep in confidence all Proprietary Information, and I will not use or disclose any Proprietary Information without the written consent of [U.S. Trust], except as disclosure may be necessary in the ordinary course of my duties as an employee of [U.S. Trust].

(3)     All documents, records, tapes, disks, and other physical property (and all copies thereof), whether or not pertaining to Proprietary Information, furnished to me by [U.S. Trust] or produced by me as an employee of [U.S. Trust] shall be and remain the sole property of [U.S. Trust] and shall be returned immediately as and when requested by [U.S. Trust]. Even if not specifically requested by [U.S. Trust], I agree that I will return and deliver all such property upon termination of my employment for any reason and that I will not take with me any such property or any copies of such property.

---

[4]     Defendant Rich also agreed not to improperly use or disclose confidential or proprietary information in the Rich Employment Agreement referenced above.

51.     As a condition of her employment with U.S. Trust, Lemons expressly agreed not to use or disclose U.S. Trust's proprietary and confidential information outside of her employment or for her own benefit (the "Lemons Agreement"). Specifically, the Lemons Agreement provides, in relevant part:

> As a condition of your employment with [U.S. Trust] you agree never to use for your own benefit, or disclose to or use for the benefit of any other person or firm, any confidential or proprietary information of U.S. Trust or any client or prospective client of U.S. Trust. You recognize that all confidential information, whether or not prepared by you in whole or in part, is the exclusive property of U.S. Trust.

52.     In addition to their other agreements and obligations, all of the former employees of U.S. Trust also agreed to abide by certain confidentiality and non-disclosure obligations. Specifically, they each agreed and certified on an annual basis that he or she would abide by the U.S. Trust Corporation Code of Business Conduct and Ethics (the "Code"). The relevant portions of the Code that is acknowledged in each former employee most recent Electronic Acknowledgments provide in pertinent part as follows:

### Individual Conduct

The following general principles guide your individual conduct:

- You will not take any action that will violate the letter or spirit of any applicable law or regulation.
- You will adhere to the highest standards of ethical conduct.
- You will maintain the confidentiality of all information you obtain in the course of your employment or directorship.
- You will escalate issues which you reasonably believe may place the Firm at risk, and report any behavior you reasonably believe is wrong.
- You will not abuse or take the Firm's assets or use them for your personal gain.
- You will not engage in any activities that create a conflict of interest between you and the firm.
- You will not act in a manner that brings discredit on the Firm.
- You will deal fairly with clients, colleagues and others.
- You will comply with Firm Policies.

## Confidentiality of Information

### Confidentiality of Client Information

As a financial services firm, we have particular responsibilities for safeguarding the information of our clients and the proprietary information of our Firm. You should be mindful of this obligation when you use the telephone, fax, electronic mail, and other electronic means of storing and transmitting information. You should not discuss confidential information in public areas where it can be overheard, read confidential documents in public places, nor leave or discard confidential documents where they can be retrieved by others. You should not discuss the affairs of the Firm with anyone except on a need-to-know basis. This includes family members and anyone at any other firm you may be associated with or transact business with on behalf of U.S. Trust. *If you have questions, you should contact the Corporate Compliance Division or the Office of the General Counsel.*

### Privacy of Client Information

U.S. Trust is committed to safeguarding its clients' privacy. We do not sell any personally identifiable client information. Sharing of such information with third parties is limited to situations related to the processing and servicing of client accounts, and to specifically delineated exceptions in the applicable privacy law. We share information with our affiliates as allowed by applicable law. You must be familiar with the firm's Privacy Policy and with the procedural and systemic safeguards we maintain to protect this information and must report any breaches of these safeguards in accordance with the Firm's procedures.

Within U.S. Trust, information concerning the identity of clients and their transactions and accounts must always be handled with care. Such information may not be disclosed to persons within the firm unless they need to know it in order to fulfill their responsibilities to the Firm.

* * *

### Protection and Use of Proprietary Information of the Firm

You have the responsibility to safeguard proprietary information of the Firm. Proprietary information includes but is not limited to intellectual property (copyrights, trademarks or patents or trade secrets), particular know-how (business or organizational designs, or business, marketing or service plans or ideas) and sensitive information about the Firm (databases, records, client-related information, salary information or unpublished financial reports).

Case 3:07-cv-00498-GCM   Document 1   Filed 11/21/07   Page 17 of 27

### E.   Stanford Group's Wrongful Conduct with Respect to the Greensboro office

53.     In November of 2006, BAC announced that it would acquire U.S. Trust, subject to regulatory approval. The intended closing date of the transaction was expected to be late first quarter of 2007, or early second quarter. During the first quarter of 2007, BAC announced the closing was expected to be effective July 1, 2007.

54.     U.S. Trust employees, including employees and officers in the Greensboro office, held planning and development sessions to prepare for the delivery of investment services following the acquisition on July 1, 2007. John Rich, in particular, participated in multiple planning and development sessions with senior U.S. Trust officials in order to prepare the Greensboro office for the acquisition.

55.     Upon information and belief, prior to the effective date, Stanford Group had been for some time encouraging and inducing the Greensboro team to resign *en mass* and use U.S. Trust's clients, trade secrets, and confidential and proprietary information using U.S. Trust's assets and information. For example, records available to U.S. Trust as of the date of filing show that Burkett was having regular telephone conversations with representatives of the Stanford Group on her cellular phone which was paid for and owned by U.S. Trust.

56.     Late in the afternoon on June 29, between 4:45 and 5:00 p.m., Saslow, Brooks and Dimock all resigned in succession. Saslow, Brooks and Dimock e-mailed Steve Frost, Managing Director for the Greensboro office, while he was out of the office on vacation and informed him that they had left letters on his desk notifying U.S. Trust of their immediate resignation. None of these employees provided U.S. Trust with any advance notice of their intended resignation, nor did they disclose their new employer.

57. Frost canceled his vacation and returned to the Greensboro office. Beginning at 7:30 a.m. on Monday, July 2, 2007, Rich, Burkett, Monforton, Watson, Boes, Wilcox, van Zee and Lemons all resigned en masse. Rich, Burkett, Monforton, Watson, Boes and Wilcox provided Frost with letters notifying U.S. Trust of their immediate resignation. Van Zee and Lemons tendered their resignation letters to their immediate supervisor, Leslie Ellis.

58. None of the members of the Greensboro team provided U.S. Trust with any advance notice of their intended resignation. In fact, upon tendering their resignation, the Greensboro team members would not even inform Frost that they would be immediately working with the Stanford Group. When Frost asked Rich where he would be working, Rich simply replied, "no comment." The other employees also refused to provide Frost any information regarding their new employer in a similar fashion.

59. Upon information and belief, each member of the Greensboro team began employment with the Stanford Group the day of their resignation from U.S. Trust, and in fact had meetings in Stanford's Charlotte office that day.

60. In executing this raid on U.S. Trust's Greensboro office, the Stanford Group obtained for itself nearly all of the Greensboro office's senior members of its client services team. They represented the primary contacts for approximately 90% of the Greensboro office's clients.

61. While at U.S. Trust, the Greensboro team serviced clients who produced more than $13 million in annual revenues for U.S. Trust in 2006 alone, and who were responsible for managing approximately $1.9 billion in client assets under U.S. Trust management.

62. It is clear that the Greensboro team had been secretly planning a mass resignation and raid of U.S. Trust's clients, trade secrets, and confidential and proprietary information for

some time. On June 23, 2007, Wilcox forwarded an extensive, confidential U.S. Trust client list to her personal e-mail account (the "Wilcox E-mail"). Wilcox's actions were in violation of numerous agreements and in breach of her obligations and duties to U.S. Trust.

63. The information forwarded by Wilcox includes an overwhelming amount of private client information about hundreds of clients, including customer names, addresses, telephone numbers, birth dates, last date contacted, type of account, etc.

64. Upon information and belief, following their commencement of employment with the Stanford Group, the Greensboro team used U.S. Trust trade secrets and confidential information to commence a pre-planned and systematic campaign of contacting U.S. Trust's clients by phone, e-mail and letter. This campaign was designed to induce U.S. Trust's clients to terminate their relationships with U.S. Trust and transfer their business to the Stanford Group.

65. Upon information and belief, the Greensboro team is engaging in, and plans to continue to engage in, *inter alia*, the following acts:

      a.    the provision of fiduciary services to individuals, trusts, estates, foundations and other nonprofit entities, employee benefit plans, corporations, partnerships or other business entities throughout the State of North Carolina;

      b.    the provision of investment management services to individuals, trusts, estates, foundations and other nonprofit entities, employee benefit plans, corporations, partnerships and other businesses throughout the State of North Carolina;

      c.    calling upon, soliciting, assisting in the solicitation of or providing fiduciary or investment management services to clients of U.S. Trust; and

      d.    soliciting and/or assisting in the solicitation of U.S. Trust employees; and

      e.    disclosing and transmitting records and documents concerning the business and affairs of U.S. Trust, including those reflecting the names, addresses, e-mail addresses, telephone numbers and investment and asset holdings of U.S. Trust clients.

66.     Upon information and belief, and as Plaintiff expects to establish upon further investigation and discovery, Stanford Group encouraged and supported the individuals in their efforts, and offered or provided significant financial incentives to the individuals based on U.S. Trust client revenue procured for the benefit of Stanford Group.

67.     Upon information and belief, and as Plaintiff expects to establish upon further investigation and discovery, Stanford Group encouraged and supported the individuals in their efforts to obtain and to convert to personal use and gain the information contained in U.S. Trust's records, U.S. Trust's property, confidential customer information used to conduct U.S. Trust's business, U.S. Trust's trade secrets, and the goodwill generated, directly and indirectly, by the former employees through their association with U.S. Trust, and to do so by means of, *inter alia*, a secret, unlawful raid and improper solicitation of clients of U.S. Trust who the individuals' either serviced or who became known to them while at U.S. Trust.

68.     On July 9, 2007, U.S. Trust, through counsel, notified Stanford Group of the post-employment obligations of the Greensboro team.

69.     Despite this notification, Stanford Group has continued to employ the Greensboro team and allowed, if not encouraged the breach of the post-employment obligations to U.S. Trust.

70.     In addition, upon information and belief, Stanford Group by and through members of the Greensboro team, continued its efforts to unfairly compete with U.S. Trust by inducing Tracy Ross and Rhonda Tate to leave U.S. Trust and join its Greensboro office.

### F. Stanford Group's Wrongful Conduct with Respect to Wilks

71.     Following the mass resignation of the Greensboro team, Stanford Group continued its raid on U.S. Trust, and induced Wilks to resign his employment.

72.     Wilks resigned from U.S. Trust on July 31, 2007, and was next employed by Stanford Group.

73.     Upon information and belief, following his commencement of employment with the Stanford Group, Wilks used U.S. Trust trade secrets and confidential information to commence a pre-planned and systematic campaign of contacting U.S. Trust's clients by phone, e-mail and letter. This campaign was designed to induce U.S. Trust's clients to terminate their relationships with U.S. Trust and transfer their business to the Stanford Group.

74.     Upon information and belief, Wilks is engaging in, and plans to continue to engage in, *inter alia*, the following acts:

      a.    the provision of fiduciary services to individuals, trusts, estates, foundations and other nonprofit entities, employee benefit plans, corporations, partnerships or other business entities throughout the State of North Carolina;

      b.    the provision of investment management services to individuals, trusts, estates, foundations and other nonprofit entities, employee benefit plans, corporations, partnerships and other businesses throughout the State of North Carolina;

      c.    calling upon, soliciting, assisting in the solicitation of or providing fiduciary or investment management services to clients of U.S. Trust; and

      d.    soliciting and/or assisting in the solicitation of U.S. Trust employees; and

      e.    disclosing and transmitting records and documents concerning the business and affairs of U.S. Trust, including those reflecting the names, addresses, e-mail addresses, telephone numbers and investment and asset holdings of U.S. Trust clients.

75.     Upon information and belief, and as Plaintiff expects to establish upon further investigation and discovery, Stanford Group encouraged and supported Wilks in his efforts, and has offered or provided significant financial incentives to Wilks based on U.S. Trust client revenue procured for the benefit of Stanford Group.

76.     Upon information and belief, and as Plaintiff expects to establish upon further investigation and discovery, Stanford Group encouraged and supported Wilks in his efforts to obtain and to convert to personal use and gain the information contained in U.S. Trust's records, U.S. Trust's property, confidential customer information used to conduct U.S. Trust's business, U.S. Trust's trade secrets, and the goodwill generated, directly and indirectly, by Wilks through his former association with U.S. Trust, and to do so by means of, *inter alia*, a secret, unlawful raid and improper solicitation of clients of U.S. Trust who Wilks either serviced or who became known to him while at U.S. Trust.

## FIRST CLAIM FOR RELIEF
## TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS

77.     The allegations of the preceding paragraphs are realleged and incorporated in this claim for relief by reference.

78.     Plaintiff has legal, reasonable and enforceable contracts and agreements with members of the Greensboro team, Ross, Tate and Wilks.

79.     Upon information and belief, through either members of the Greensboro team, Ross, Tate or Wilks, the Stanford Group knew or should have known of the existence of these contracts, and nevertheless tortiously induced, aided and encouraged the Greensboro team, Ross, Tate and Wilks to breach these contractual obligations and agreements.

80.     The Stanford Group's conduct was and is without privilege or justification.

81.     Upon information and belief, as a result of the Stanford Group's inducement, members of the Greensboro team, Ross, Tate and/or Wilks breached said contracts as outlined above by, *inter alia*, using or disclosing U.S. Trust's confidential business information and/or trade secrets and/or soliciting U.S. Trust's clients and/or employees.

82. As a consequence of the foregoing, U.S. Trust has suffered and will continue to suffer irreparable harm and loss.

## SECOND CLAIM FOR RELIEF
## TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS – RELATIONS WITH U.S. TRUST CLIENTS

83. The allegations of the preceding paragraphs are realleged and incorporated in this claim for relief by reference.

84. Plaintiff has existing business relations with its clients, which relations the Greensboro team, Ross, Tate, and/or Wilks knew about through their employment with U.S. Trust and as a result of their duties in providing services to U.S. Trust's clients, which knowledge is also now imputed to the Stanford Group.

85. The foregoing conduct by the Stanford Group was intended to cause the breach or termination of Plaintiff's business relations with one or more of its clients.

86. Defendant's conduct was and is without privilege or justification.

87. Upon information and belief, Defendant had an improper motive and/or used improper means to interfere with Plaintiff's business relations with its clients, including by the Greensboro team, Ross, Tate and Wilks to breach their duty of loyalty and fiduciary duty, and violating their contractual obligations and agreements.

88. As a consequence of the foregoing, U.S. Trust has suffered and will continue to suffer irreparable harm and loss.

## THIRD CLAIM FOR RELIEF
## UNFAIR TRADE PRACTICES

89.     The allegations of the preceding paragraphs are realleged and incorporated in this claim for relief by reference.

90.     Stanford Group's inducement of U.S. Trust employees to resign *en mass*, benefited Stanford Group through the appropriation of U.S. Trust's intellectual knowledge and was designed to damage U.S. Trust's business.

91.     Stanford Group's unlawful and wrongful activities described herein are unfair methods of competition, unfair and deceptive acts or practices, and unconscionable business conduct, all in violation of the common law and Chapter 75 of the North Carolina General Statutes.

92.     Those actions were "in or affecting commerce" as that phrase is defined by N.C. Gen. Stat. § 75-1.1.

93.     The Stanford Group's unfair trade practices have directly and proximately caused or will directly and proximately cause damage to Plaintiff's business. The full extent of Plaintiff's injury caused by Defendant's conduct is incapable of exact proof at this time.

94.     Pursuant to N.C. Gen. Stat. § 75-16, Plaintiff is entitled to treble their actual damages. Pursuant to N.C. Gen. Stat. § 75-16.1, Plaintiff is entitled to their reasonable attorney's fees incurred in the prosecution of this action.

95.     As a consequence of the foregoing, U.S. Trust has suffered and will continue to suffer irreparable harm and loss.

## FOURTH CLAIM FOR RELIEF
## MISAPPROPRIATION OF TRADE SECRETS

96.     The allegations of the preceding paragraphs are realleged and incorporated in this claim for relief by reference.

97.     Stanford Group's unlawful and wrongful activities described herein are a misappropriation of Plaintiff's trade secrets, in violation of the common law and Chapter 66 of the North Carolina General Statutes.

98.     Upon information and belief, in violation of N.C. Gen. Stat. § 66-152 (1), Defendant has acquired, disclosed, or used a trade secret of U.S. Trust without express or implied authority or consent.

99.     Upon information and belief, such trade secret was not arrived at by independent development, reverse engineering, or obtained from another person with a right to disclose the trade secret.

100.    Upon information and belief, U.S. Trust's confidential business information, obtained by former U.S. Trust employees, was used by Stanford Group, otherwise, the same former U.S. Trust employees could not have assembled the business it enjoys today.

101.    As a consequence of the foregoing, U.S. Trust has suffered and will continue to suffer irreparable harm and loss.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

1.      Award Plaintiff all equitable relief that it is entitled to under the facts and applicable law;

2.     Award Plaintiff compensatory damages, punitive damages, attorneys' fees, pre-judgment and post-judgment interest, and costs based on the claims for relief set forth above; and

3.     Award Plaintiff any other relief the Court deems proper.


Respectfully submitted this __ day of November, 2007.

                              HELMS MULLISS & WICKER, PLLC.

                              /s/ John G. McDonald_____
                              Irving M. Brenner
                              State Bar No. 15483
                              John G. McDonald
                              State Bar No. 23848
                              Makila A. Sands
                              State Bar No. 37212
                              Jordan Sykes
                              State Bar No. 35599
                              Post Office Box 31247
                              Charlotte, North Carolina 28231
                              Telephone: (704) 343-2000

C894644.3